## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**UNITED STATES OF AMERICA**

**v**                                                    **CASE NO: 5:20-cr-55-Oc-28PRL**

**XAVIER SIMS**

_____/

## REPORT AND RECOMMENDATION[1]

Defendant Xavier Sims is charged by indictment with a single count of being a felon in knowing possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 1). A jury trial is set for the February 2021 trial term. (Doc. 27).

Sims has moved to suppress evidence, including the firearm and ammunition that is the basis for the prosecution, arguing that they were seized in violation of his Fourth Amendment rights. (Doc. 24). [2] For the reasons explained below, I submit that Sims's motion to suppress be denied.

## I.   BACKGROUND

On January 14, 2021, the Court held an in-person hearing on Sims's motion to suppress. The government presented evidence including the recordings of 911 calls and the testimony of numerous witnesses with the Marion County Sheriff's Office. In addition to the

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. See Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

[2] In his brief, Sims also seeks to suppress any statements made by him on the basis of the Fourth Amendment and fruit of the poisonous tree doctrine, although he did not make specific arguments regarding that issue.

witness testimony, both the government and the Defendant introduced exhibits into evidence that the Court has reviewed.

### A. 911 Calls

The government's presentation began with the 911 calls relevant to the incident. The first call was made on the evening of February 2, 2020 by a woman identified as T.M., who reported that her "kids' father" threatened to "shoot [her] house up" and that she was scared to go home. On the call, T.M. reported that her daughter saw a weapon in her father's lap. She also reported in real time that he was currently following her vehicle and that he was driving a silver Dodge Neon. T.M. identified Xavier Sims as the person threatening and following her. She described him as a Black male, 35 years old, wearing a blue shirt, and having black/brown hair. She also reported that he had a driver's license that said his name was Dantzler.

A few hours later, at approximately 1:01 a.m. in the early morning hours of February 3, 2020, T.M. made a second call to 911. T.M. reported that her children's father had "shot up my house," and identified him as Xavier Sims, being 5'8", a Black male, 35 years old, and reported that he had earlier been driving his girlfriend's silver Dodge Neon.

Around the same time, two other 911 calls were received. One came from a neighbor who reported six to seven "rapid fire" shots in the area. The second came from T.M's brother, who called from T.M's same residence and reported bullet holes and shots fired into the house.

### B. Testimony of Deputy Devin Burgoyne

The government next presented the testimony of Deputy Devin Burgoyne. Deputy Burgoyne testified that while on duty on February 2, 2020, at approximately 8:51 p.m., he

responded to a call involving a woman identified as T.M. On the call, T.M. reported that her ex-boyfriend had made harassing phone calls and was following her. Burgoyne testified that he made contact with T.M. in front of an apartment building by the side of the road. T.M. reported that her ex-boyfriend (who was also the father of her children) had threatened her over the phone to "shoot up her house," and had told her that if she didn't let him see her new boyfriend, he would come to her house and shoot. T.M. identified her ex-boyfriend as Xavier Sims, but also reported that he may give the name Xavier Dantzler. T.M. reported that when Sims had been following her, he was driving a silver Dodge neon.

Burgoyne also spoke with T.M's eight-year-old daughter[3] who had been with Sims earlier that day. The daughter told Burgoyne that she saw Sims with a gun in his lap, and that she heard him talking to himself saying that he would shoot T.M. in the back of the head and would burn down her house. While he was with T.M., Burgoyne also overheard a phone conversation (while T.M's phone was on speaker) between Sims and T.M., wherein Sims did not deny the threats T.M. claimed he made.

Burgoyne then attempted to locate Sims and, in the interim, confirmed via teletype equipment that Sims was a convicted felon. Burgoyne located Sims at his residence and observed a silver Dodge Neon parked with the door open. Sims was in the front yard and Burgoyne questioned him about what T.M. had reported. Sims denied making threats and claimed T.M. was making them up. Burgoyne testified that, at that point, it was a "he said/she said" situation and he did not have any physical evidence, so he decided not to arrest Sims at that time.

---

[3] Testimony established that, while T.M.'s daughter was eight years old when she spoke with Burgoyne, she was within days of her ninth birthday.

A few hours later while still on duty, Burgoyne saw that there had been a reported shooting. He recognized the vehicle reported to be involved (a silver Dodge Neon) and responded to the traffic stop where the driver of the Dodge Neon had been detained. He testified that the traffic stop was outside of his assigned zone, but he responded out of concern. Burgoyne testified that he wanted to make sure his fellow officers knew what had happened earlier and to confirm whether Sims was involved.

Upon arrival, Burgoyne made contact with Corporal Sullivan (who performed the traffic stop) and observed the silver Dodge Neon and Sims, whom he recognized from his investigation earlier that night. Meanwhile, Sims produced two different driver's licenses, both an invalid Florida license with the name Xavier Sims and a valid Georgia license with the name Xavier Dantzler. The officers discussed whether they could arrest Sims for driving with a suspended license but were uncertain whether that was appropriate due to Sims having a valid Georgia license. As this transpired, numerous other officers had also responded to the scene.

Soon thereafter, Sullivan, a K-9 officer, decided to walk his police canine Adelmo around the Dodge Neon and perform an open-air sniff of the vehicle. Burgoyne testified that when Sullivan did so, the dog alerted to the odor of narcotics. At that point, Burgoyne and Sullivan searched the vehicle. Burgoyne searched the passenger side and trunk. Inside the trunk and underneath the spare tire, Burgoyne found a Glock firearm wrapped inside a black hoodie, shell casings and additional ammunition.

4

C.      Testimony of Corporal Colton Sullivan

The government also presented the testimony of Corporal Colton Sullivan, a K-9 officer with considerable law enforcement and K-9 handling experience. Sullivan's testimony included the presentation of footage from his bodycam.

Sullivan testified that he was on patrol at approximately 1:00 a.m. when he received a BOLO ("Be-On-The-Lookout") alert over his radio regarding a reported drive by shooting and that a silver Dodge Neon was possibly involved. Dispatch also provided notification that an individual identified as Xavier Sims had earlier threatened to shoot the residence, and another deputy had investigated that incident.

As Sullivan was traveling eastbound on Maricamp Road, he observed a silver Dodge Neon heading in the opposite direction westbound on Maricamp Road. He made a u-turn to follow the vehicle, called in the tag information, and called for backup. Sullivan explained that because a violent crime had occurred, he was taking all safety precautions and the stop would be treated as a felony stop.

Sullivan continued to follow the vehicle and it turned into a gas station. Sullivan observed that the driver of the vehicle was a Black male, about 35 years old, and 5'8". Sullivan informed the driver (who was later identified as Sims) that he was being detained for investigation of a violent crime. Sims produced the two different driver's licenses.

After Sims had been detained about six minutes, Sullivan and his fellow officers discussed whether he could "take a ride" (i.e., be arrested) for the invalid Florida license. There was some confusion and discussion about whether he could be arrested in light of his also having a valid Georgia license. Sullivan testified that those conversations were part of a

continuing investigation regarding the shooting incident. Ultimately, Sullivan decided to conduct an open-air sniff of the vehicle using his K-9 dog, Adelmo.[4]

During the open-air sniff, Adelmo alerted near the rear passenger door seam. Sullivan explained that the alert indicated that narcotics or the odor of narcotics had been in the vehicle. Following the alert, the officers decided to search the vehicle and discovered the gun and other evidence in the vehicle's trunk. Sullivan then turned the investigation over to Deputy Rafferty, who arrested Sims.

Sullivan further testified that he later confirmed that T.M.'s 911 call reporting the shooting had been received at approximately 1:01 a.m., and he first observed the silver Dodge Neon about 12 minutes later. Sullivan confirmed that when he initially observed the vehicle, he was traveling eastbound on Maricamp Road (toward the location of the shooting), and the Neon was traveling westbound on Maricamp Road (away from the location of the shooting). Sullivan's testimony also established that from the time the traffic stop occurred to the time of the vehicle search was approximately 23 minutes.

## II.  LEGAL STANDARDS

An officer may, consistent with the Fourth Amendment, "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The "reasonable suspicion" standard is less demanding than the "probable cause" standard: it requires the officer to articulate "a minimal level of objective justification for making the stop" that is more than "an inchoate and unparticularized suspicion or 'hunch'

---

[4] The Court notes that the government also presented extensive testimony from Sullivan regarding both his own and Adermo's K-9 certifications and training.

of criminal activity." *Id.* at 124 (quoting *Terry*, 392 U.S. at 27). The standard is an objective one, based on the totality of the circumstances. *U.S. v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). The Court views the circumstances in light of the officer's special training and experience. *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000). Notably, reasonable suspicion does not require that the observed behavior is actually unlawful and can be "formed by observing exclusively legal activity." *Acosta*, 363 F.3d at 1145. The determination of reasonable suspicion is based on "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

## III.   DISCUSSION

Sims moves to suppress evidence including the firearm and ammunition on the grounds that it was seized in violation of the Fourth Amendment.

First, Sims contends that his seizure based on the BOLO was unreasonable because the responding officers lacked reasonable suspicion or probable cause. Sims's argument is based, in part, on the fact that when Sims appeared in state court on charges related to the incident, the state court found probable cause as to the possession of a firearm by a convicted felon but no probable cause as to the charges of firing a missile into a dwelling, use or display of a firearm during a felony, and discharging a firearm from a vehicle charges.

As the Court stated during the hearing, it is not bound by the state court's rulings regarding probable cause. And, while Defendant requested that the Court take judicial notice of the state court's rulings, Defendant does not affirmatively argue that the state court ruling binds this Court. To the contrary, the state court's probable cause determination does not have any preclusive effect on this Court. *See, e.g., Smith v. City of Oak Hill, Fla.*, No. 6:11-CV-

1332-ORL-31, 2013 WL 140232, at *5 (M.D. Fla. Jan. 11, 2013) (finding that collateral estoppel doctrine did not bind federal court to state court's probable cause determination).

Sims argues that even if law enforcement had reasonable suspicion to conduct a stop, the stop matured into an arrest without probable cause in violation of Sims's Fourth Amendment rights to be free from unreasonable seizures. Sims contends that law enforcement exceeded the scope and duration of a permissible stop of Sims based on reasonable suspicion. Sims argues that "[t]here was no independent individualized suspicion to justify the dog sniff and the dog sniff was not tailored to the mission of the stop." (Doc. 24, p. 14). Sims also argues that the dog sniff added to the time of the stop and the detention, leading to a Fourth Amendment violation. Sims contends that, under the circumstances, the approximately 23-minute stop was too long. He thus moves to suppress any evidence obtained as a result of the stop as fruit of the poisonous tree.

Finally, Sims contends that there was not probable cause to search the vehicle and its trunk, and the search violated the Fourth Amendment. Sims argues that K9 Adelmo reportedly alerted to narcotics, but no narcotics were found anywhere in the vehicle, and that the open-air sniff was not part of a narcotics investigation. Sims thus challenges the reliability of the alert provided by the K9 and interpreted by his partner Sullivan.

Based on the evidence presented at the hearing, including the 911 calls, bodycam footage, and the credible and direct testimony of both Burgoyne and Sullivan, the undersigned easily concludes that probable cause existed to conduct the traffic stop, detain Sims as a suspect in the investigation of the shooting incident, search the vehicle and, ultimately, arrest Sims.

Notably, the separate 911 calls, and especially the 911 calls by T.M. which provided considerable details about the incident, Sims's physical description, Sims's involvement, and the silver Dodge Neon he was possibly driving, may provide reasonable suspicion for the traffic stop. The Supreme Court has held that anonymous 911 calls can provide reasonable suspicion for traffic stops where they provide "adequate indicia of reliability." *Navarette v. California*, 572 U.S. 393 (2014). Factors to consider are whether (1) the caller claims eyewitness knowledge of the event; (2) the call was a contemporaneous report; and (3) the caller used the 911 system. *Id.* at 398-400. In this case, T.M.'s calls satisfy these factors and the numerous details contained in the calls provided indicia of reliability.

Beyond that, the information known to Sullivan provided reasonable suspicion for the traffic stop. Here, Sullivan testified that he was attempting to respond to the shooting incident and was traveling in the direction of the incident when he observed a vehicle matching the description of the silver Dodge Neon contained in the BOLO traveling in the opposite direction (i.e., away from the location of the shooting). Sullivan's testimony established that the vehicle's location and the time that had elapsed since the shooting were consistent with the vehicle being involved. Before performing the traffic stop, Sullivan called in the vehicle's license plate number and confirmed it was likely registered to Sims' girlfriend. After the Neon pulled into a gas station and Sullivan made contact with the driver, he also confirmed that the driver matched the physical description of the suspect in the BOLO. Sullivan then further confirmed that the driver was Xavier Sims. Sims then produced two different driver's licenses with two different names, and one of them was invalid.[5] All of these details, which were

---

[5] Yet another indicia of reliability of T.M's statements to Burgoyne and in the 911 calls is that Sims indeed produced identification with the name Dantzler, consistent with T.M.'s report that he also used that name and had a driver's license in that name.

known to Sullivan at the time, are sufficient to provide probable cause for the traffic stop and detention.

It is also significant that Sullivan was joined at the stop by other officers, including Burgoyne, who recognized Sims and provided important details regarding the investigation he had conducted just a few hours earlier. Sullivan also spoke via phone with the officer acting as the zone supervisor at the location of the shooting of T.M's home. In other words, the officers were actively investigating the shooting incident and gathering considerable information that all added to their reasonable suspicions that Sims had been involved in the shooting. *See United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990) ("when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.").

As to the search of the vehicle and its trunk, the government established at least two grounds to justify that search. First, the search falls within the "automobile exception" to the warrant requirement. The officers were permitted to search the vehicle because (1) it was readily mobile; and (2) they had probable cause for a search. *See United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). "Probable cause, in turn, exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006) (citation and internal quotation marks omitted).

Under the circumstances, including the timeline of events and all the details known to the officers at the scene, the officers had reason to believe that the firearm that had fired shots into T.M.'s house would be inside the silver Dodge Neon driven by Sims. Although the officers at the time did not appear to consider the automobile exception as a basis for the

search, that subjective decision is irrelevant to the Court's probable cause analysis here. (So too are some of the unhelpful comments made at the scene, which did not distract Corporal Sullivan or deter him in his effort to conduct a thorough and diligent investigation.)

Second, probable cause existed to search the vehicle once canine Adelmo alerted to the odor of narcotics. *See Tamari*, 454 F.3d at 1265 ("[w]e have long recognized that 'probable cause arises when a drug-trained canine alerts to drugs.'") (citation omitted). The police canine's alert was itself sufficient to give the officers probable cause to search Sims's vehicle. *See id.* The Court also notes that an open-air sniff like the one conducted in this case does not implicate the Fourth Amendment. *See id.* at n.6. The open-air sniff was lawful, so long as it did not prolong the traffic stop, and Sullivan's testimony established that it did not. As to the challenge to Sullivan and Adelmo's qualifications and the reliability or interpretation of the alert, the Court also finds that Sullivan's extensive uncontroverted testimony regarding their training, certifications, and the reliability of Adelmo's alert to be credible.

Further, I find that the officers did not exceed the scope of the traffic stop. The Eleventh Circuit considers "four non-exclusive factors" when determining whether a given seizure was and remained a Terry stop rather an arrest. *See, e.g., United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004); *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000). Those factors are: (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *Acosta*, 363 F.3d at 1146 (quoting *Gil*, 204 F.3d at 1351). The Eleventh Circuit has held that even a detention of up to 75 minutes did not transform a stop into an arrest. *Gil*, 204 F.3d at 1350-51. There is also no delineated time limitation for the permissible duration of a Terry stop. *See Acosta*, 363 F.3d at 1147. The

approximately 23-minute duration of the stop in this case did not transform the stop into an arrest, and the scope and diligence with which the investigation proceeded is entirely appropriate given the overall circumstances.

Based upon the evidence presented at the hearing, I submit that Sullivan had probable cause to stop Sims, to continue to detain him for the length of the stop, and to search his vehicle. Consequently, Sims's motion to suppress the evidence obtained as a result of that traffic stop is due to be denied.

## IV.    Recommendation

Accordingly, and for the reasons stated herein, it is **recommended** that Sims's motion to suppress (Doc. 24) be **denied.**

Recommended in Ocala, Florida on January 22, 2021.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:
Presiding District Judge
Counsel of Record